**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JOY MICHELLE BOWDEN,**

   **Plaintiff,**

**vs.**                                                              **CIVIL ACTION NO. 3:16-02418**

**CAROLYN W. COLVIN
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

   **Defendant.**

**<u>MEMORANDUM OPINION</u>**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Presently pending before the Court are parties' cross-motions for Judgment on the Pleadings. (Document Nos. 11 and 12.) Both parties have consented in writing to a decision by the United States Magistrate Judge.[1] (Document Nos. 7 and 8.)

The Plaintiff, hereinafter "Claimant", Joy Michelle Bowden, filed an application for DIB benefits on May 26, 2009[2] (protective filing date), alleging disability since January 15, 2008, due to "bipolar, borderline personality disorder, alcohol addiction, and depression".[3] (Tr. at 272.) Claimant's application was denied initially and upon reconsideration. (Tr. at 108, 109.) On

---

[1] Initially, this case was assigned to United States Magistrate Judge Cheryl A. Eifert, but was reassigned to the undersigned by Order entered August 24, 2016. (Document No. 13.)

[2] The undersigned notes that Claimant avers that the Application Summary for Disability Insurance Benefits states the application date is May 27, 2009 (Tr. at 247-252.), however, this is immaterial to the undersigned's findings herein.

[3] On her form Disability Report – Appeal, undated, Claimant asserted that since her last disability report dated December 22, 2009, she was "worse – cannot leave home, can't pay bills or take care of self, cannot see anyone but family, depressed [eats] and sleeps a lot". (Tr. at 332.)

February 12, 2010, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 148-149.) A hearing was held on June 27, 2011, before the Honorable Andrew J. Chwalibog. (Tr. at 81-107.) ALJ Chwalibog denied her claim by decision dated January 27, 2012. (Tr. at 110-129.) Claimant requested review on March 30, 2012 (Tr. at 190, 366-367, 372-376.) and by Order entered April 3, 2013, the Appeals Council granted same, vacated the decision and remanded for further proceedings.[4] (Tr. at 130-133.) Another hearing was held on April 22, 2014 before the Honorable Michele M. Kelley. (Tr. at 36-79.) The ALJ denied her claim by decision dated July 23, 2014. (Tr. at 8-35.) The ALJ's decision became the final decision of the Commissioner on January 16, 2016 when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) On March 14, 2016, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant

---

[4] The case was remanded because Claimant requested a supplemental hearing, which was not granted, contrary to HALLEX I-2-7-30H. (Tr. at 10, 131-133.)

is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

(c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and

3

how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1).[5] Fourth, if the claimant's impairment(s) is/are deemed severe, the

---

[5] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

In this particular case, the ALJ determined that Claimant last met the insured status requirements of the Social Security Act on September 30, 2011. (Tr. at 14, Finding No. 1.) The ALJ then found that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, January 15, 2008 through September 30, 2011, her date last insured ("DLI"). (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: affective and anxiety disorders. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id., Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform a full range of work at all exertional levels, with the following non-exertional limitations:

she can understand, remember and carry out unskilled up to SVP2 work; can maintain concentration, attention and persistence for two-hour segments, during an eight-hour workday and a five-day workweek; can make only simple work decisions; can tolerate only occasional changes in routine work settings; can tolerate only occasional interaction with supervisors and coworkers in an object-focused work setting; cannot tolerate interaction with the public as a part of work duties; and cannot work at a fixed production rate-pace but can do goal-oriented work.

(Tr. at 16, Finding No. 5.) At step four, the ALJ found that Claimant was capable of performing past relevant work as a hotel maid and banquet set-up person, and that this work did not require the performance of work-related activities precluded by the RFC. (Tr. at 26, Finding No. 6.) On this basis, benefits were denied. (Tr. at 28, Finding No. 7.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on April 9, 1983, and was 31 years old at the time of the ALJ's decision. (Tr. at 43.) Claimant is single, has no children, and dropped out of high school in the tenth grade, but obtained her GED. (Tr. at 44.) She attended Marshall University for two years, then a culinary school in Pittsburg, Pennsylvania for two years, and returned to Marshall for a culinary program, but did not obtain a certificate or degree from either institution. (Id.) Claimant had numerous jobs in the years prior to the alleged onset date, having previously worked as a cashier, waitress, banquet server, deli worker, fast food worker, hotel maid, in home care provider, prep cook/hot cook, short order cook, and telemarketer. (Tr. at 284-285.)

Issues on Appeal

Claimant has alleged three main errors in support of her appeal: (1) that the ALJ erred in her finding that Claimant did not meet 12.04 of the Listings (Document No. 11 at 5-8.); (2) that the ALJ's decision is not supported by substantial evidence because she did not abide by Regulations with regard to the weight she gave to the opinion of Claimant's treating psychiatrist (Id. at 7-9.); and (3) that the ALJ's decision is not based on substantial evidence she disregarded the opinion of the vocational expert that Claimant is incapable of substantial gainful activity based on the consistent opinions of both treating and examining/consulting sources concerning Claimant's mental limitations. (Id. at 9.)

The Relevant Evidence of Record[6]

---

[6] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

The Court has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Prestera Mental Health Center; Treating Psychiatrist, Kambiz Soleymani, M.D.:

On May 28, 2011, Dr. Soleymani noted Claimant reported "I'm doing okay" though she continued to have bouts of depression and irritability, but not as severe as before. (Tr. at 637.) She reported no side effects to medication and that it helped her deal with issues. (Id.) It was noted that Claimant failed "again" to do the blood test that was ordered; she "spends most of her day in front of the computer talking to people"; she refused to go to therapy because she did not like the therapist; she had poor eye contact, restricted affect; she was urged to do the blood test as soon as possible to see results of thyroid panel; and she denied abusing drugs or alcohol. (Tr. at 637-638.)

On June 21, 2011, Dr. Soleymani completed a "Mental Status Statement Ability to do Work-Related Activities" indicating that he began treating Claimant since March 20, 2010. (Tr. at 738.) His diagnoses included bipolar disorder, most recent episode depressed, without psychotic features, generalized anxiety disorder, and obesity. (Id.) He described Claimant's mental impairment and symptoms as moderate, and estimated her GAF score during the past year as 60.[7] (Id.) He rated Claimant had no impairment in understanding remembering and carrying out simple instructions or in the ability to make judgments on simple work-related decisions. (Tr. at 739.) He rated Claimant had a "mild" impairment in her ability to understand and remember complex

---

[7] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

instructions and in her ability to make judgments on complex work-related decisions, and he found her to have "moderate" impairment in carrying out complex instructions. (Id.) With regard to Claimant's "signs and symptoms" that would inhibit working abilities, Dr. Soleymani found that she was "moderate" in terms of "pervasive loss of interest in almost all activities"; "appetite disturbance with weight change"; "decreased energy"; "generalized persistent anxiety"; "persistent disturbances of mood or affect"; and "emotional withdrawal or isolation"; and that she was "marked" in terms of "blunt, flat or inappropriate affect." (Tr. at 739-740.) It further noted that Claimant denied current or recent alcohol/substance abuse. (Tr. at 741.)

Dr. Soleymani wrote a "To Whom It May Concern" note, dated July 22, 2011, stating that Claimant had been compliant with treatment and had not missed her appointments. (Tr. at 764.) He also stated that "there are no recent or current problems with alcohol or drugs" and that he believed that "at this time, it would be detrimental to her mental health for her to work." (Id.)

By letter dated November 15, 2011, Dr. Soleymani advised Claimant's attorney that she continued to have symptoms even when she was not abusing drugs and alcohol. (Tr. at 793.) Dr. Soleymani saw Claimant four times during 2010 and on December 11, 2010, he noted she was calmer without major mood swings, anhedonia, anxiety or insomnia, but his other notes showed she continued to be symptomatic. (Id.) Dr. Soleymani agreed with Dr. Tessnear's assessment that Claimant had moderate limitations in her social functioning when she was not abusing drugs and alcohol. (Id.) He stated that Claimant was "rarely stable for a long period of time even without abusing any alcohol or drug", but that Claimant was "only partially compliant with treatment", as "reflected on her lithium level which was mostly below therapeutic level, missing appointments at times and not interest[ed] in psychotherapy." (Id.) Dr. Soleymani noted that Claimant "has been

consistently denying abusing alcohol", but when she reported of increasing symptoms on October 9, 2011, he smelled alcohol on her breath and that left the office without taking her prescription. (Id.)

Richard Reeser, M.A:

At Claimant's attorney's request, Mr. Reeser performed a psychological evaluation on July 21, 2011. (Tr. at 757-760.) Mr. Reeser administered the Vineland II[8] and Millon Clinical Multiaxial Inventory III (MCMI-III). (Tr. at 757.) On mental status examination, Mr. Reeser observed that Claimant was casually groomed and her demeanor reserved and "minimally cooperative". (Tr. at 758.) She did not establish eye contact, her affect flat and her mood was depressed and anxious; she was oriented to person, place, month, and year, but "would not guess the day"; denied having hallucinations for the past two years or delusions; had logical thought content; good recent and remote memory; and judgment and insight were fair. (Id.)

Claimant's MCMI-III profile "presented validity concerns" but was interpretable; Claimant's response style was indicative of "a broad tendency to magnify the level of experienced illness or a characterological inclination to complain or to be self-pitying." (Id.) "On the other hand, the response style may convey feelings of extreme vulnerability that are associated with a current episode of acute turmoil." (Id.)

Mr. Reeser made the following diagnoses: Schizoaffective Disorder; Psychoactive Substance Abuse NOS, in Remission; Anxiety Disorder NOS (Bipolar Disorder, Major Depression, and [Generalized Anxiety Disorder] by history); Borderline Personality Disorder; Schizotypal Personality Disorder with Negativistic (Passive-Aggressive) and Schizoid Traits; and

---

[8] Mr. Reeser identified Claimant's grandmother, Beatrice Bowden, as the "informant" on this test. (Tr. at 758.)

GAF score of 45.[9] (Tr. at 759.)

Based on his interview, Claimant's history, and the test results, Mr. Reeser concluded that Claimant showed

> a pattern of severe social withdrawal with a mix of mood disorder symptoms such as depression, anxiety, and psychotic features. A very low level of adaptive function was [indicated] with severe impairment noted in the area of socialization. These problems markedly compromise her ability to secure and sustain gainful employment. Given her history of substance abuse, she may benefit from support in managing any funds awarded her.

 (Tr. at 760.)

Mr. Reeser also provided a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" and opined that Claimant had "no impairment" in understanding, remembering, and carrying out simple instructions or in making judgments on simple work-related decisions; and "moderate" impairment in understanding, remembering, and carrying out complex instructions. (Tr. at 761.) He opined that Claimant had "marked" ability in making judgments on complex work-related decisions. (Id.) Mr. Reeser arrived at these conclusions because Claimant's "moodiness and irritability would compromise her functioning in the[se] [] areas." He also rated Claimant as "extremely impaired" in her ability to interact appropriately with supervisors, co-workers, and the public, as well as in her ability to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. at 762.) He based these findings on his interview, her history, and test results that "show there is a major limitation in this area." (Id.) Mr. Reeser further opined that the aforementioned limitations were present "2 years ago" and that alcohol and/or substance abuse were not contributing factors. (Id.)

---

[9] A GAF of 41-50 indicates that the person has "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

State Agency Psychological Examiner:

On October 12, 2009, Lisa C. Tate, M.A. provided a psychological evaluation on Claimant at the Commissioner's request. (Tr. at 519-524.) Records provided to Ms. Tate included: a comprehensive diagnostic evaluation by Prestera Mental Health dated January 23, 2008; and a discharge summary from St. Mary's Hospital with admission date January 27, 2008 and discharge date of February 13, 2008. (Tr. at 520-521.) The mental status examination revealed that Claimant was oriented to all four spheres; depressed mood; restricted affect; logical and coherent thought processes; no indication of delusions, obsessive thoughts or compulsive behaviors; no unusual perceptual experiences; normal judgment; no suicidal and homicidal ideation; immediate and recent memories were within normal limits; remote memory was mildly deficient based on her ability to provide background information; concentration was within normal limits; and normal psychomotor behavior. (Tr. at 522.) Ms. Tate diagnosed Claimant with mood disorder, NOS and polysubstance dependence in remission. (Id.) Ms. Tate opined Claimant's social functioning was within normal limits based on interaction with staff during the evaluation; her concentration, persistence and pace were also within normal limits; Ms. Tate found Claimant capable of managing her own benefits. (Tr. at 523.)

On July 18, 2011, Ms. Tate performed another psychological evaluation. (Tr. at 747-753.) The mental status examination revealed that Claimant's judgment was within normal limits and her insight was fair. (Tr. at 750.) Ms. Tate noted her recent, intermediate and remote memory, and concentration, persistence and pace were all within normal limits. (Id.) Ms. Tate also observed that Claimant was cooperative and friendly during testing and that it was easy to establish and maintain rapport. (Id.) Ms. Tate administered the on the Wide Range Achievement Test – Fourth Edition

(WRAT-4): Claimant scored above the twelfth grade level. (Tr. at 751.) Claimant reported that she spent her day using the computer or reading and went to her grandmother's house to eat once each day. (Id.) Claimant also reported that she went to the grocery store twice a month and went to Prestera Mental Health Center once every 1 to 2 months. (Tr. at 752.) Diagnoses included: major depressive disorder, recurrent, moderate with features of anxiety; and polysubstance dependence, in sustained remission. (Tr. at 751.)

On August 1, 2011, Ms. Tate completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)," in which she concluded that Claimant had no limitation in understanding, remembering and carrying out instructions, based upon her average intellectual functioning and normal memory and concentration. (Tr. at 754.) Ms. Tate also found that Claimant was mildly limited in her ability to interact supervisors, and coworkers and the public. (Tr. at 755.) Ms. Tate opined Claimant was incapable of managing her benefits in her own best interest. (Tr. at 756.)

Pamela S. Tessnear, Ph.D.:[10]

At the request of ALJ Chwalibog, on September 23, 2011, Dr. Tessnear responded to written interrogatories and provided a medical source statement (mental) with respect to Claimant's application for benefits after having been provided all the relevant medical records for her review. (Tr. at 780-791.) With respect to the areas of functional limitations, Dr. Tessnear opined: Claimant's impairments in activities of daily living were mild; in social functioning, Claimant's impairment was moderate, unless she was abusing substances, then she has marked impairment; in concentration, persistence or pace, Claimant's impairment was mild; Dr. Tessnear

---

[10] It is noted from the record that Dr. Tessnear's medical specialty is "clinical psychology". (Tr. at 788.)

found no records supporting evidence of repeated episodes of decompensation. (Tr. at 782-783.) Dr. Tessnear noted that the evidence did not indicate that Claimant's impairments equal or met a Listing, but her condition worsened when she abused substances. (Tr. at 783.)

Dr. Tessnear did not find evidence supported diagnoses offered in [Exhibit] 21F because "[t]hey appear to be based largely on the results of the MCMI-III" which had validity concerns; there was no evidence of schizoaffective disorder, and hallucinations were only reported by Claimant when she was using substances. (Tr. at 784.) Dr. Tessnear found Claimant's poor treatment compliance noteworthy. (Tr. at 782, 784.) She did not agree with [Dr. Soleymani]'s opinion that work was detrimental to Claimant's mental health, stating there was no evidence in the record to support this and that this conflicted with the mental health ratings he provided in [Exhibit] 16F. (Tr. at 784.) Dr. Tessnear opined that Claimant has the ability to engage in full time employment depending upon the type of work; based on Claimant's report that she used her computer at home for extended sessions, Dr. Tessnear opined that Claimant could attend to a task for that period of time, but should be in a low stress work setting requiring minimal interactions with other workers, assuming she remains substance free and compliant with treatment. (Id.)

Dr. Tessnear also completed a Medical Assessment of Ability to do Work-Related Actities (Mental), and opined Claimant's ability to function independently and maintain attention/concentration was "good", that her ability to follow work rules, relate to co-workers, use judgment, interact with supervisor(s), deal with work stresses was "fair", and her ability to deal with the public was "poor". (Tr. at 786.) In terms of Claimant's ability to understand, remember and carry out complex job instructions, Dr. Tessnear found Claimant was "fair". (Tr. at 787.) In terms of her ability to understand, remember and carry out detailed, but not complex job

instructions, Claimant's ability was "good", and in understanding, remembering and carrying out simple job instructions, "unlimited". (Id.) Dr. Tessnear found Claimant had "good" ability to maintain personal appearance and demonstrate reliability, and "fair" ability to behave in an emotionally stable manner and relate predictably in social situations. (Id.) This was due to Claimant's anxiety around people and her mood fluctuations. (Id.) Finally, Dr. Tessnear concluded that Claimant was not capable of managing benefits in her own best interest due to her history of substance abuse. (Tr. at 788.)

The Administrative Hearing

Claimant Testimony:

Claimant was raised by her grandmother/adopted mother and lived with her for as long as she can remember. (Tr. at 48-49.) She testified that she was depressed and inactive, which may have contributed to her weight gain; her weight was 300 pounds at 5'9" tall. (Tr. at 46.) She never had a driver's license, but she stated she was not a good driver, and it makes her nervous. (Tr. at 46-47.) She testified that she smokes about a pack a day, and she receives food stamps. (Tr. at 47.) She previously abused drugs, however, after her discharge inpatient psychiatric treatment at St. Mary's Hospital, she has been clean and sober since January 2009. (Tr. at 47-48.) Since her discharge, she had been treated by her psychiatrist, Dr. Soleymani, who prescribes her medication; she sees him every two months. (Tr. at 48.)

With regard to difficulties in the work place, Claimant testified that she does not deal with people or stress well; she gets panic attacks and cannot get anything done. (Tr. at 49.) She does not leave her home except for doctor appointments and to the grocery store once or twice a month. (Tr. at 49-50.) She does not socialize at all. (Tr. at 50.) She spends her time reading, writing, and "doing

solitary things". (Id.) Claimant stated she has difficulty concentrating, finishing what she starts, but will clean her home. (Id.) She does not prepare her own meals; she takes care of her personal hygiene. (Tr. at 50-51.)

It is difficult for her to leave her house because she gets nervous and scared to go anywhere; it was difficult for her to meet with her attorney and to come to the hearing. (Tr. at 51.)

Beatrice Bowden Testimony:

Mrs. Bowden is Claimant's biological grandmother and adoptive mother. (Tr. at 52.) When they lived in Florida, she provided childcare for Claimant when she was young because Claimant's mother worked and traveled a lot with her job, eventually Claimant came to live with her. (Tr. at 53.) When Mrs. Bowden and her husband left for West Virginia, they left Claimant with her mother in Florida, but Claimant stopped eating and was not doing well, so Mrs. Bowden returned to Florida and brought Claimant back with her to West Virginia where she has lived with them ever since. (Tr. at 54-55.)

Mrs. Bowden testified that during her school age years, Claimant did not interact well with other children, she would not eat around them. (Tr. at 55.) Claimant would not go around the other children or interact with anyone at school. (Tr. at 56.) Mrs. Bowden testified that Claimant had been in the gifted intelligence program from second grade on, but she took her out of school in the tenth grade due to failing grades. (Id.) When she went to Marshall University at sixteen, her grades were very good, but she still did not interact with other students. (Tr. at 58.)

Mrs. Bowden said that Claimant wanted to attend culinary school, and did well there, but she still did not interact with others, and when her roommate locked her out of their dormitory, she would just cry in the hallway rather than get security to let her in. (Tr. at 59.) At culinary school,

Claimant got involved with a boyfriend as well as substance abuse. (Id.)

Claimant lives in a small house behind Mrs. Bowden's house; she does not leave her home unless she has to, and she rarely eats at Mrs. Bowden's house, maybe once a year. (Tr. at 60.) Claimant tried to work many times, she would work for a while, but then she would become panicked and overwhelmed and could not go back. (Tr. at 61.) Mrs. Bowden testified that Claimant never makes eye contact with people, and when she is forced to go out, she becomes very stressed out and breaks down and cries. (Tr. at 62.) Claimant tried therapy, but she could not do it. (Tr. at 63.)

Mrs. Bowden testified that she did not think Claimant could have worked full time consistently around September 2011 because she cannot be out of her house that long or be around other people; it is too overwhelming for her. (Id.) Mrs. Bowden testified that Claimant will not leave the house even see her half siblings or her own mother; when she is face-to-face with her mother, then she is fine. (Tr. at 64.) Claimant is unable to go grocery shopping unless it is late at night with fewer people in the store and she has to run in and out. (Tr. at 65.)

Mrs. Bowden testified that she thinks Claimant's medications help her a little bit, but "she's still not there", and would be much worse without them. (Tr. at 65-66.) Trying to get Claimant to obtain a West Virginia ID was a battle. (Tr. at 66.)

In response to questions from the ALJ, Mrs. Bowden testified that Claimant only had two boyfriends, but the relationships did not last because Claimant does not do well with relationships. (Tr. at 67.) The only friends Claimant had was when she attended culinary school in Pittsburgh, and doing drugs and alcohol with them; Mrs. Bowden testified that Claimant has not used drugs or alcohol for the past four or five years. (Tr. at 68-69.) She testified that she is not sure how much

Claimant smokes, because she buys tobacco and rolls her own cigarettes; she would like Claimant to stop smoking, but does not feel that she is in the right frame of mind to quit yet. (Tr. at 69.)

Gina Baldwin, Vocational Expert (VE) Testimony:

The ALJ asked the VE a hypothetical with Claimant's age, work history and educational background who can understand, remember, and carry out unskilled jobs up to specific vocational preparation; can maintain concentration, attention and persistence for two-hour segments during an eight-hour workday for five days a week; can only make simple work decisions and only tolerate occasional changes in a routine work setting and tolerate only occasional interaction with supervisors and coworkers in an object focused work setting; and cannot tolerate interaction with the public as a part of her work duty. (Tr. at 72-73.) In response, the VE testified that such an individual could perform her past work as a hotel maid and banquet setup person, but could not perform the banquet setup person as Claimant performed it. (Tr. at 73.) The VE said that other work available ranging from heavy to sedentary exertional levels included building maintenance worker, furniture cleaner, bakery wrapper, machine feeder, grader/sorter, and bench worker. (Tr. at 73-74.) With an additional limitation that the individual could not work in fixed production rate pace, the VE responded that the individual could perform Claimant's past work as banquet setup worker and maid, as well as all the other jobs the VE identified under the first hypothetical. (Tr. at 75.) The VE stated that if such an individual, under both hypotheticals would be off task 20 percent of the eight-hour work day due to mental impairments, the individual could perform no jobs. (Tr. at 75-76.)

In response to questioning by Claimant's attorney, the VE testified that no jobs would be available if the individual described above had extreme limitations in ability to interact

appropriately with the public, supervisors, coworkers and ability to respond appropriately to usual work situations and changes in routine work setting. (Tr. at 76.) The VE testified that if the individual, on a consistent basis, experienced an anxiety or panic attack and have to stop a few minutes to collect herself when confronted with interacting with supervisors, the general public, or coworkers, the individual would be precluded from employment. (Tr. at 77.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant contends that she suffers from the following impairments: affective disorder; anxiety disorder, schizoaffective disorder; psychoactive substance abuse NOS in remission; bipolar disorder; major depression; generalized anxiety disorder; borderline personality disorder; schizotypal personality disorder with negativistic (passive-aggressive) and schizoid traits; and obesity. (Document No. 11 at 3.) She argues that the ALJ erred by finding her impairments do not meeting Listing 12.04 when she found Claimant's polysubstance abuse was not a severe impairment, therefore her mental impairments alone meet the Listing. (<u>Id</u>. at 7.) The ALJ's decision is inconsistent with ALJ Chwalibog's decision, which found Claimant met Listing 12.04 but included Claimant's polysubstance abuse impairment; Claimant's mental impairments have remained, and clearly have not diminished since ceasing substance abuse. (<u>Id</u>. 7-8.) Next, Claimant argues that the ALJ disregarded the Regulations by not giving controlling weight to her treating psychiatrist's opinion, but only selectively gave significant weight to some of his findings and little weight to others. (<u>Id</u>. at 7-9.) Finally, Claimant states that the ALJ erred when she disregarded the VE's testimony that Claimant is unable to work due to severe mental impairments as found by Richard Reeser, M.A., whose opinions are consistent with those provided by Dr. Soleymani. (<u>Id</u>. at 9.) Claimant prays for reversal of the ALJ's decision and an award of benefits, or remand for

further proceedings. (Id.)

In response, the Commissioner argues that the Appeals Council vacated ALJ Chwalibog's decision, including his findings, and has no legal force or effect, therefore, Claimant cannot rely on the prior decision.[11] (Document No. 12 at 5.) Further, the prior decision was made upon a finding that polysubstance abuse contributed to her disability, which would preclude DIB benefits as advised by ALJ Kelley. See Mitchell v. Comm'r of Soc. Sec., 182 F.3d, 272, 274 (4th Cir. 1999). (Id. at 6.) The ALJ properly concluded that Claimant's impairments did not meet or equal Listing 12.04 because she did not satisfy "paragraph B" or "paragraph C" criteria and provided numerous citations in the record supporting those findings. (Id. at 6-9.) The Commissioner argues that pursuant to controlling case law and the Regulations, the ALJ properly weighed the opinion evidence from Claimant's treating psychiatrist and the consulting examiner because she noted inconsistencies in the treatment records, conclusions not supported by explanation, and further, the ALJ did not have to assign weight to their opinions on issues reserved to the Commissioner. (Id. at 9-14.) Finally, the Commissioner contends that the ALJ did not have to accept the VE's response to Claimant's attorney's query because it included the severe limitations found by Mr. Reeser, that no other physician or psychologist had found, plus the ALJ had noted Mr. Reeser's opinion was internally inconsistent, was based on invalid test results, and was inaccurate. (Id. at 15.) The Commissioner asks the Court to affirm the decision because it is based on substantial evidence. (Id.)

Analysis

Meeting Listing 12.04:

---

[11] Monroe v. Colvin, No. 7:13-cv-74-FL, 2014 WL 7404136, at *2 (E.D.N.C. Dec. 30, 2014); Albright v. Chater, 174 F.3d 473, 479 (4th Cir. 1999).

As an initial matter, the undersigned agrees with the Commissioner that ALJ Kelley was not bound by the decision entered by ALJ Chwalibog, because the Appeals Council explicitly vacated same, and remanded the matter back for a supplemental hearing, as noted *supra*. Accordingly, the only issues before this Court concern ALJ Kelley's findings and whether they were made in accordance to law, and were based upon substantial evidence.

An impairment meets a Listing if it satisfies <u>all</u> the specified medical criteria. <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990) (emphasis added); SSR 83-19, 1983 WL 312248, at *23. (1983). The ALJ found Claimant had two severe mental impairments, affective and anxiety disorder, and found Claimant's polysubstance abuse and obesity were not severe impairments. (Tr. at 14.)

With regard to "paragraph B" criteria, the ALJ found Claimant had mild restriction in her activities of daily living. (Tr. at 15.) The ALJ provided numerous citations in the record in support of this finding: (1) on April 17, 2009, during an intake evaluation at Prestera Mental Health Center, Claimant stated that she "currently does not experience any difficulty with activities of daily living, such as cooking, cleaning, bathing, etc." (Tr. at 15, 568.); (2) in her July 2, 2009 "Function Report - Adult," Claimant stated that she had a hard time getting motivated to do things, such as bathing, dressing, caring for her hair, but was able to care for her dog, including bathing him and cutting his toenails (Tr. at 15, 307-308.); (3) when evaluated on February 22, 2010, Claimant again reported no problems with self-care and activities of daily living (Tr. at 15, 584.); and (4) at the hearing, Claimant testified she was able to attend to her own personal hygiene, and clean her home, but her grandmother prepares her meals. (Tr. at 15, 50-51.)

In the area of social functioning, the ALJ found Claimant had moderate limitation and provided several citations in the record in support of this finding: (1) Claimant attended her

doctors' appointments once or twice a month, while maintaining that she "loathed every minute of it" (Tr. at 15, 314.); (2) Claimant went grocery shopping in stores, and shopped about once a month for a couple of hours (Tr. at 15, 313.); (3) Claimant had been able to meet and develop relationships with boyfriends (Tr. at 15, 67.); (4) Claimant said she loses patience with people, however, she chatted online with gaming friends (Tr. at 15, 312, 314.); (5) Claimant reported she despises authority figures, feeling that they are usually inept and get in the way (Tr. 15, 316);[12] (6) Claimant testified that she does not get out of the house very often and only goes to doctor's appointments and to her grandmother's home (Tr. at 15, 49-50.); (7) Claimant does not go out with her grandparents when they go places (Tr. at 15, 49-50.); (8) during the October 19, 2009 consultative psychological examination, Lisa Tate, M.A., a licensed psychologist, noted that Claimant had a boyfriend and had normal social functioning (Tr. at 15, 523.); (9) during the July 26, 2011 consultative psychological examination, Ms. Tate observed that Claimant was relaxed and comfortable during psychological testing and reported that she eats at her grandmother's house once a day (Tr. at 15, 751.); and (10) Ms. Tate noted that Claimant's thought processes appeared to be logical and coherent. (Tr. at 15, 750.)

In terms of concentration, persistence or pace, the ALJ found Claimant had mild difficulties. (Tr. at 15.) In support of this finding, the ALJ noted the following: (1) Claimant reported in her written statements that she was easily distracted even when trying hard to finish a task (Tr. at 15, 315.); (2) Claimant stated that she forgets things randomly, such how to prepare a meal she has always made, or how to spell a word (Id.); (3) Claimant said that she tended to drift away about halfway through a conversation (Id.); (4) Claimant does not follow spoken instructions

---

[12] It is noted that the first five examples noted by the ALJ are from Claimant's responses in the Function Report – Adult, dated July 9, 2009.

well, stating it was easier for her easier to follow written instructions because she could re-read them (Id.); (5) Claimant maintained that she was not good with money, stating she does not remember what she spends, and has a lot of credit card debt because she charges everything during spending sprees (Tr. at 15, 313-314.); (6) Claimant played online games and cards, read, wrote, watched television, played music, and made drawings (Tr. at 15, 314.);[13] (7) in April 2009, Claimant reported to Prestera Mental Health Center that she liked crossword puzzles and reading (Tr. at 15, 668.); (8) Claimant reported to Ms. Tate during the October 2009 evaluation that she used her computer 8 to 12 hours daily (Tr. at 15, 523.); (9) Ms. Tate had observed that Claimant had normal to mildly deficient memory and normal concentration, persistence, and pace (Id.); (10) Claimant told Dr. Soleymani during a May 28, 2011 medication check-up that she spent most of the day in front of the computer "talking to people" and she reported that her medication had been helping her deal with her issues, especially depression (Tr. at 15, 632.); (11) in July 2011, Ms. Tate observed that Claimant had normal memory, concentration, persistence, and pace (Tr. at 16, 750.); and (12) during the July 2011 examination by Mr. Richard Reeser, M.A., Claimant reported that she spent her time playing games on the computer and reading mysteries. (Tr. at 16, 757.)

Finally, the ALJ found that Claimant experienced two episodes of decompensation, which were of extended duration. (Tr. at 16.) This was due to Claimant's first hospitalization from January 27, 2008 through February 13, 2008 for major depression disorder, dysthymia, mood disorder and substance dependence, mixed, continuous (alcohol, cocaine, cannabis). (Tr. at 16, 472.) Claimant's second hospitalization occurred from January 15, 2009 through March 9, 2009 for major depressive disorder, dysthymia, mood disorder and substance dependence, mixed,

---

[13] The first six instances under this finding were also from Claimant's Function Report – Adult.

continuous (cocaine, cannabis). (Tr. at 16, 608-635.)

The ALJ found no evidence establishing "paragraph C" criteria. (Tr. at 16.)

In light of the pertinent Regulations, cited *supra*, and given the evidence in the record as noted by the ALJ, the undersigned finds her conclusion that Claimant's impairments do not meet the Listings is supported by substantial evidence.

<u>Evaluation of Opinion Evidence:</u>

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. <u>See</u> 20 C.F.R. § 404.1527(c)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." <u>Ward v. Chater</u>, 924 F. Supp. 53, 55 (W.D. Va. 1996); <u>see also</u>, 20 C.F.R. § 404.1527(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. <u>Id</u>. Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6). These factors include: (1) Length of the treatment

relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors.[14] Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 404.1527(c)(2).

Claimant contends that the ALJ erred by not giving proper deference to the opinions provided by Dr. Soleymani and Mr. Reeser; both opined that Claimant is incapable of substantial gainful activity. The ALJ gave Dr. Soleymani's July 2011 opinion that "it would be detrimental to [Claimant's] mental health for her to work" little weight. (Tr. at 25.) For starters, the ALJ noted that Dr. Soleymani did not provide any significant evidence to support this statement. (Id.) Further, the ALJ found that the medical evidence of record showed that Claimant had not always been compliant with treatment, in that psychotherapy was suggested on more than one occasion, but she had refused; she also missed appointments and run out of medications. (Tr. at 25, 553, 567.) The ALJ also noted that this opinion was inconsistent with Dr. Soleymani's opinion offered months earlier, and in his June 2011 record when he assessed Claimant a GAF score of 60; opined that she had no or only mild mental limitations; only one moderate limitation in carrying out complex instructions; and unknown ability in how she would interact with supervisors, coworkers, and the public and respond to usual work situations and changes in a routine work setting. (Tr. at 24, 738-739.)

The ALJ also considered Dr. Soleymani's April 2014 opinion that Claimant had marked difficulties in understanding, remembering and carrying out complex instructions, and had

---

[14] It is noted that the ALJ referenced these Regulations in the written decision. (Tr. at 16.)

moderate to marked difficulty working a regular job due to unstable moods, depression, poor interaction, isolation, and focus. (Tr. 26, 877-891.) The ALJ assigned this opinion "no significant weight" because it was not explained, was inconsistent with his previous opinions, and was inconsistent with the assessments from Prestera Mental Health Center giving Claimant "GAF scores that were generally around 65".[15] (Tr. at 26, 829, 833, 837, 840, 843, 846, 850, 854, 858, 862, 866, 870, 877.) Finally, the ALJ noted that the April 2014 opinion had been rendered long after Claimant's disability insurance status had expired. (Tr. at 26.)

With respect to Mr. Reeser's opinion, the ALJ gave it "no significant weight" because some of the MCMI-III test results were compromised by questionable symptom magnification. (Tr. at 24, 758.) The ALJ noted that to the extent that Mr. Reeser's medical source statement suggested that Claimant had marked impairment in social functioning and making judgments on complex work-related decisions, it was internally inconsistent, and also inaccurate regarding Claimant's compliance with advised treatment. (Tr. at 24, 760, 761, 762.)

In regards to Dr. Soleymani and Mr. Reeser giving an opinion on Claimant's disability status, it is well known that the responsibility for deciding issues of disability, including a claimant's RFC, is expressly reserved to the Commissioner. See, 20 C.F.R. § 404.1527(d)(1)-(2). Moreover, medical source opinions on those issues are not entitled to any special weight. See, Id. § 404.1527(d)(3). The ALJ therefore appropriately declined to assign weight to these conclusory opinions.

---

[15] A GAF of 61-70 indicates that the person has "some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

After thorough review of the ALJ's discussion and findings regarding the medical evidence of record, as well as the opinion evidence tendered in this case, the undersigned finds that the ALJ provided ample reasons for her conclusions, which were adequately explained in the written decision. Accordingly, the ALJ's evaluation of the opinion evidence, and in particular, the opinion evidence from Dr. Soleymani and Mr. Reeser, is based upon the substantial evidence

RFC Assessment:

The RFC finding is the reflection of a claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. § 404.1545(a). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Given the ALJ's hypothetical, described *supra* under the VE's testimony, the VE opined that an individual with Claimant's profile could perform her past relevant work as a hotel maid and banquet set-up person. (Tr. at 26.) This finding precludes disability under the Regulations. See 20 C.F.R. § 404.1560(b)(3). Claimant contends that the RFC assessment does not properly reflect her severe mental limitations found by Mr. Reeser. As discussed above, the ALJ properly discounted Mr. Reeser's opinion due to internal inconsistencies, inconsistencies with the medical evidence of record as a whole, as well as his findings were based in part on invalid testing results. Further, the ALJ did not have to assign any special significance to Mr. Reeser's conclusion that

27

Claimant was disabled, an opinion that Dr. Soleymani shared only in July 2011 and in April 2014, despite the ALJ's noting his contradicting treatment records.

The RFC "fairly" set out all of Claimant's impairments, insofar as the opinion evidence was properly evaluated, and given Claimant's mental limitations; further, the VE provided relevant evidence within her field of expertise that proved helpful to the ALJ, particularly when she proceeded to the fifth step in the sequential evaluation process to determine other jobs in the national economy that Claimant could perform.[16] (Tr. at 26-27.) Accordingly, the undersigned finds that the ALJ properly excluded Mr. Reeser's limitations in crafting Claimant's RFC and was based upon substantial evidence. See, e.g., Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989).

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.) is **DENIED**, the Defendant's Motion for Judgment on the Pleadings (Document No. 12.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED** and this matter is hereby **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to provide copies of this Order to all counsel of record.

ENTER: January 13, 2017.

Omar J. Aboulhosn
United States Magistrate Judge

---

[16] It is noted that the ALJ had no duty to proceed to this step pursuant to the sequential evaluation process, but elected to provide "alternative findings" under her RFC assessment. Id. § 404.1520(a)(4).

28